Good morning, your honors. May I please report? Sure. I'm James C. Angleton, and I represent Mr. Alex Dushi. I respectfully request two minutes for rebuttal. We would like to have this case remanded to the Board of Immigration Appeals  without his residence with her in Greece and his baptismal certificate and the other information. Let me just ask a question. Doesn't the fact that your client affirmatively stated at the airport that he had never been arrested bring this case within the purview of Lee v. Ashcroft? How is Lee v. Ashcroft distinguishable? Well, your honor, we have Singh v. INS. And Singh found that an arriving alien who had suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country. And he testified at his hearing that he was frightened. He was terrified that he was going to be sent back to Albania with a record of his interview at the airport. Excuse me, in Singh, though, wasn't there a problem of translation difficulties, which really didn't exist in this case? Yes, there was, your honor, but this part of Singh is dealing with the abuse Singh received. But was there an inconsistency, or was there just a lack of details? He didn't report the more dramatic incidents. My recollection of Singh was that he hadn't said one thing in the airport interview and then a different thing, an inconsistent, conflicting thing in the hearing. Well, one issue was the fact that it was so badly recorded, Singh. I mean, they weren't too sure what had been said. But I believe that here, here Singh does say that abuse in the home country during interrogation can make somebody frightened and reluctant to reveal everything at the first time he talks to a U.S. official. But in Singh, there were real translation problems as well as recording problems. Wasn't that true? Yes, there was, your honor. Were there any translation problems there? None at all. He was just frightened. Yes, your honor. He was 21 years old at this time. He had testified to three arrests and then one attempt at a shooting. The third arrest was in Billish right before he fled. The beating was conducted by the Billish chief of police with three other police officers. And he was cut with a knife and he fainted and he was taken to a hospital because he was terrified. And he said that he had friends in Albania who had fled asylum in Europe and they were sent back to Albania with a record of what they had said. Now, this fear has been borne out in the motion for judicial notice. There were two cases that I brought to the court's attention. One involved a man from Belarus. It was an unpublished BIA decision. And it was remanded to the immigration court against government opposition because the government had sent the Belarusian government notification that this man was an opponent of the Belarusian government. And the government opposition found that Belarus was an authoritarian country and that this man had a well-founded fear of persecution because this information had been released. And as I said in a later update letter, calling the 800 number indicates that this man was granted relief. How do you explain the doctor's report that didn't mention his knife wound? Well, again, another Singh case talks about how an omission is not a contradiction. A contradiction is making two opposite statements. Whereas an omission, this Singh case said that testimony that gives a detail that has been omitted from a written report is not a contradiction. And they found him credible. I noticed that the doctor had told him not to report anything, and that was the same doctor that left it out of the report that he sent. Yes, Dr. Tosca, you are. Yeah, yeah. The thing is, too, is that his father was ñ this is Albania. His father was beaten up shortly after he was beaten up. Dr. Tosca did the report on the father. Now, if you look at the reports, the format for both reports is the same. Dr. Tosca's signature is at the bottom right-hand corner of the Albanian versions. That matches. Now, the case Alvarez-Fanfan says that a jury can compare signatures and determine whether this is authentic or not. And I think this is what should have been done here once they were calling this into question. Also, Dr. Tosca, that's right, he was the omnibus man. He was the person you would report abuse to. The Albanian law has created this because of the human rights abuses that go on in Albania. But Mr. Dushi had been beaten up by the police chief of Velesht, right where Dr. Tosca was serving. I mean, this put Dr. Tosca in problem because there doesn't seem to have any structural place for him except he's just assigned there to the police station. And I think given all of the fear that was going on, this was right before the election, all the fear that was going on, Dr. Tosca may have intentionally just omitted this. But Mr. Dushi couldn't control that. He was a very young man. When he came to the airport, he was younger than. He did have the wound. Yes, he did have the wound, and he showed it to the judge, and it was identified as a scar on the forearm about one inch long. And did the IJ or the BIA address Dushi's explanations or explain why they didn't believe his explanations? I think there was a BIA decision. Maybe it's a passing reference, but it doesn't go into it. I mean, it points out that the Singh case, they tried to distinguish Singh because of the other problems with Singh that Mr. Dushi didn't have. But also we have the Nigerian case in the motion for judicial notice, Oseghe, I believe, and that's a Seventh Circuit case in which the government falsely told the Nigerian government that Oseghe had committed crimes, and he hadn't. But the Seventh Circuit said that by saying this to the Nigerian government, he is in trouble because they will look into his record and find out he's a BIA or a human rights worker. And they then found him entitled to asylum. I mean, what Mr. Dushi feared, the logic borne out by these cases, is that it's not going to be confidential. And Officer Fernandez did not promise confidentiality at the airport, and he conducted actually an exclusion hearing or interview. You've come in with false documents, haven't you? Yes. Don't you know that you can't appeal this? I mean, Mr. Dushi, I can see why he thought right there he was going to be sent back to Albania, and he did not want to talk to this man freely. I mean, the MOAB, a 28-J letter I wrote about the – it was a Seventh Circuit decision. It said that when a person who's been evasive, that supports credibility of persecution. And that fact is that less than the reliability of an airport interview include a lack of follow-up questions that were developed through applicants' claim of persecution. There were no follow-up questions. He'd say, I want asylum. And maybe the next question would be something about how much money you have or something. This was an exclusion. They just followed a script. Yes, Your Honor. They were following a prepared script because he had violated the visa waiver program. He had come in with a false Belgian passport and Belgium visa waiver program, so they wanted to determine if he had come in with false documents. Now, if he hadn't sought asylum, he would have been sent home right away. And so you can see the emphasis was are you legally here or not, not do you want asylum and let me see if I can help you. There's no – I raised this with the board. I didn't raise it here. This is much different than the asylum office, say, in Anaheim, where these people are sensitized. You wanted to save some time. Pardon me, Your Honor? You wanted to save some time. Yes, Your Honor. You better save it. You've got 46 seconds. Pardon me? You now have 46 seconds. Okay. If you want to save it, you should probably. We're as tough as those guys at the border. Okay. I would just like to point out that the BIA and the IJ violated Sid Hu's rule that the petitioner must be given an opportunity at his IJ hearing to explain his failure to produce material cooperating evidence. Moreover, the cooperating evidence must be both material to the petitioner's asylum claim and non-duplicative of other cooperation. Thus, where an applicant produces credible cooperating evidence to bust an aspect of his own testimony, an IJ may not face an adverse credibility determination on the applicant's failure to produce additional evidence that would further support that particular claim. Finally, as we have indicated, the evidence must be easily available. As we have held in Lopez-Reyes, it is inappropriate to base an adverse credibility determination on an applicant's inability to obtain cooperating affidavits from relatives or acquaintances living outside the United States. Such corroboration is never easily available. And this business of corroboration came up when? Well, it came up. The IJ had said she wanted two documents produced. That was a record of a name change because he had changed his name from Alex Dushy to Alexander Dushy. And she also wanted a translation of the military booklet. And then she said, and anything else. Now, we presented them. She could have looked through them to see what she got or if she wanted anything else. She didn't. At another hearing, we made this presentation. And then she wrote an opinion that found him not credible. And one of the big reasons was because he didn't produce a letter from his aunt or affidavit from his aunt in Greece indicating the length of time he stayed with her from November to January. But is it true the military records show that he was in the military service? Yes, Your Honor. Therefore confirming that he had only been in Greece three months. Well, it didn't completely. Our military records started in October 1998 and ended in 1999. He came back to Albania in January. He joined the Democratic Party. This was the most important document. And he was a member of the Democratic Party in June 1998. And the party booklet shows payment of dues until December 2000. The military was so corrupt that his father got him out with a bribe after a few months. Thank you. Thank you, Your Honor. Thank you. Thank you. Okay. Thank you, Your Honors. Mr. Angleton, good morning to you. And may it please the Court, I'm Joseph Hardy for the Attorney General. The Court should deny both petitions for review because the Board properly found Mr. Ducey adversely credible and it properly denied the motion to reopen. Mr. Angleton and I agree that there are inconsistencies between the sworn statement and Mr. Ducey's later testimony. We disagree as to the effect of those inconsistencies. Counsel, the real question, for instance, how do the inconsistencies regarding Ducey's time in Greece go to the heart of his asylum claim? I think they go very much to the heart of his asylum claim. If he's there in Greece between September 97 and sometime in 2000, that means that the three arrests didn't happen to him. The three arrests were in 98 and 2 in 2001. So that just means that they didn't happen to him is the issue. I know he says that he lied to the or gave an incorrect statement to the inspector because he was scared. Well, if you look at page AR-269, that's where he first says that he was scared. But if you look a few lines down, he also says that he was scared during the testimony himself. So the IJ has a problem. Which story do I believe? He submitted at least three 28-J letters discussing one, I think, just Berzon's dissent in Tufi. He cited, as you sort of say, the case about the Belarusian. And there was a more recent one. If you're scared at the airport interview, you're still scared here. Well, which story do we believe? How do we know that you're telling the truth at either statement? So the IJ properly looked at those inconsistencies and found them adversely credible. Well, but we know that he was in prison. I'm sorry? We know that he was in prison. In prison? Yes. When? When he had that stab wound and when the doctor did that report. That's another thing. Dr. Toskes, one of the other issues that the IJ noted was the omission from Dr. Toskes' note of the slit wrist. When his attorney, not DHS, not the judge, asked him, did anything happen to you at that June 18, 2001 incident, assuming that it did happen, the only thing he said was, if you look at my wrist, there's a cut here where one of the officers cut me. If you look at Dr. Toskes' note, Judge Nelson, as you mentioned, I believe, it's not in the note. So the problem with the omission, it's not a matter of I know the difference between an omission and a contradiction. The fact is that the doctor's note, which is the note that he submitted, does not corroborate his statements that he was actually persecuted during that time. When you consider that amongst the other things. Well, the doctor told him, the doctor was with the police, wasn't he? And the doctor told him that, you know, you don't want to go complaining. We don't want to put this stuff in here because you'd get in trouble. Well, then, if you note, the doctor's note also says that he was beaten about the head and the back. So what's the difference between a stabbing and officers beating? If the only thing that you're going to mention that happened to you, and I heard Mr. Angleton just said it himself, the only thing that he said happened to him was that slip or cut on his wrist. Why wouldn't the doctor mention the one thing that happened to you? Why would he lie and say other bad things happened to him? The story just is implausible, if anything. Well, doesn't the country report tell us what was going on in Albania and how people were treated there and handled by the police? I don't doubt that at the time in Albania. I'm sorry? Yeah, go ahead. I don't doubt that at the time Albania was a bad country. Right now it is a democratic country, as we know. It is one of the members of NATO. But the question is, was this it? Well, one, we don't even know if this man is out executing himself. All we know, he came in on a fraudulent passport, so we don't actually know who he is. He represented to the DHS officer at the time. Well, he said he came in. The way I understood it, he came in on a fraudulent passport because he was trying to save himself and get to this country and ask for asylum. But at the same time, there are no questions that there are concerns about the man's credibility. He's admitted that there are inconsistencies in his testimony. So, you know, it ultimately comes down to the standard. I mean, people come to this country.  Someone's put on the phone, and there's a series of questions that are asked to them. And do they get a chance to make any explanation? Well, I mean, if you'll... They don't even know who the person is on the other line. I'm sorry, are you referring to the interpreter? Yeah. Well, I mean, it doesn't matter. As Mr. Angleton said, there were no translation issues. He doesn't question that the Albanian interpreter interpreted everything he said properly. He doesn't. I know Singh, I think there was a question that the interpreter had tried to bribe the man. There were problems with the recordation of what he said and things like that. We don't have that issue here. The only thing we know is that Mr. Dushi himself, if you look at page 269 and page 270, he said, yes, there was an Albanian interpreter. As far as we know, he voiced no objection to the admission of that document. He stated on page 308 that he was in good health, that he wasn't on any medication. Page 309, he said he understood all the questions. On page 309, he said no one forced him to answer any of the questions. The only thing we know is on page 269, he said that he was scared, that he wouldn't get the confidentiality. I note that Mr. Angleton, for the first time before this court, he's suggesting that, like in Singh, there's a suggestion that there wasn't a verbatim transcription of the airport interview, but that was not his claim before the board. The only two claims he raised before the IJ was that he was scared. The only two claims that he raised before the board was that he was scared. What I would suggest is sort of a perjury trap defense, that he should not have been in an asylum interview because as a visa waiver applicant, he wasn't able to have an asylum interview. Well, one, it wasn't an asylum interview. Every person that comes in, and if there's a question about the reason why they're in the United States, they're subject to an airport interview. This was an airport interview, not an asylum interview. Because he is a visa waiver applicant, the only thing that he could challenge at the time is the denial of an application for asylum withholding of removal or protection under CAT. So that's what he was seeking. To the extent that he was afraid that Greece might find out, or excuse me, that Albania might find out, I note that he also stated at the hearing that he applied for asylum in Greece, and apparently they denied it. We don't have any proof of whether he even applied or whether they denied it or not. But he returned to Albania, and to the extent that anything did happen to him, if something did happen, we don't know if it was on the basis of Greece denying his application or him making claims against Albania. Even in the airport interview himself, even to the extent that he said he wasn't arrested, he also said, well, there's no freedom there. So what would be the reason for, you know, to say one thing but not say the other thing, saying that there's no freedom there is pretty much just as bad as saying that I was arrested when I was there. I don't get the point of that. I'm sorry? I don't get the point of that last statement. He's saying that the reason why I lied to the inspector at the airport is because I was scared. Well, you were scared at the test. You were scared during the marriage hearing in March 2004. So it ultimately comes down to the standard of review. It's a substantial evidence test. Does the evidence compel the conclusion contrary to what the I.J. has found? And here, I mean, there's no question that Judge Aikuda, I think I've heard you say, and Judge Nelson, I think I've heard you say, there's no question that there are inconsistencies here. Chuck Shube, in many cases, even before the passage of the real I.J. The question is whether they go to the heart of it. And they go to the heart of the claim. If he was not in Albania in 98 or in 2001, as he says, then these incidents simply did not happen to him. What did he say in the airport interview that would be of concern if it got back to Albania? I know he said that he had been arrested or that the big inconsistency was he said he had never been arrested when later at the mayor's hearing he said he had been arrested three times by the Albanian police. My question was that Albania presumably knew he had been arrested, and so had it got back to Albania that he reported he had been arrested three times, I couldn't understand why that would cause a problem for him in Albania. But was there anything else, any other inconsistency that he was concerned about getting back to Albania? As far as I know, like I said, he mentioned that there was no freedom there. So I'm thinking that's the only other thing. He said there are no rights in my country. There are no schools. The U.S. would give me freedom. He said his family was part of the class called Dekadans. But I think that was under the communist government, which ended in Albania, I believe, in 1995. Actually, he testified it ended in 1995. So it was an issue of what the socialists had taken over for the communists for that time between 1995 and, I guess, 2005. The socialists are no longer there. His Democratic Party is in power now. So ultimately, as far as the corroboration, would you like, you still haven't even spoken about the motion to reopen, I don't know. I would like your comment on that. May I speak about the corroboration first? Yes. Okay. As far as the corroboration, as both the IJ and the board noted, there's no SIDU problem here. The SIDU and, I believe, MHIA, M-E-J-I-A, were cases where the immigration judge based the adverse credibility determination solely on the lack of corroboration. Here the IJ is just saying, look, there are many other issues regarding your credibility. I'm just noticing this to say, look, cumulatively, there are problems with your credibility. The aunt is in Greece. And the only thing, he doesn't question the IJ's requiring this corroboration. He only says that the IJ speculated in thinking that he could get the letter from the aunt. Well, he got the letter from the aunt in 2004. And I can move on to the motion to reopen from there. And the only thing he said, the board denied the motion to reopen for two reasons, correct? The evidence wasn't new or previously unavailable, and it was immaterial. The aunt's notice and the baptism certificate, if I put those two together, the only reason why he's saying that he could not have previously discovered those before is because he lost contact with the aunt between November 2004, which is when the IJ issued the decision in March 2006 when I believe he got the documents. But as the board noted, he never said that he wasn't in touch with the aunt prior to November 2004, and I guess between January 2002 and November 2004. The regulations require the documents to not be previously available during the hearing. There's no allegations that those documents were not available during the hearing. And the same goes for Professor Fishers. I guess that's an affidavit. I'm not exactly sure what that is. And that just goes to the fear that he says of why he... Did the IJ give him an opportunity to explain why he hadn't yet gotten the letter from the aunt? No, and I acknowledge that. He said the IJ did not specifically say, you know, bring me... One, the IJ did not specifically say, bring me a letter from your aunt. And I'm acknowledging that. But ultimately, DHS actually pointed out that there are inconsistencies, one regarding his name, regarding the birth certificate, which bore the name Alex Ducey. But if he had changed his name to Alex Ducey, it doesn't quite explain why. Well, he explained that. He said that he didn't regard his name as being changed until he was, what, baptized, huh? It doesn't explain why the birth certificate bears the name Alex Ducey. As Mr. Angleton said, his name was Ellis Ducey. Presumably, you're born Ellis Ducey. Why wouldn't your birth certificate bear that same name? Or the judge had asked him for a name change document. He never got it, or excuse me, she never got a name change document actually showing that this man is... You know, a lot of people look at their birth certificates, even in this country, and see that the name written on it is different from the name that they've been called. And I agree. My mother's name is written wrong on my birth certificate. Yeah. My name was written wrong, too, on my birth certificate. Your name was written wrong. I'm assuming that you're saying it was written wrong with something different than... Your name isn't Judge Pregerson, but what's on it? I believe it's Harry Pregerson, right? It's something a little different from Harry. It's not something that... It was Harold. It's not Alex versus Ellis. Well, they're pretty close, you know. You get doctors and the way they write, and they cross things out. And I'll just say the last thing. As far as the materiality, this case reminds me of two cases. Toofiegee, which was a 2008 decision that Mr. Angleton submitted a 28-J letter on. They didn't want to submit another 28-J letter on the same case. And Almaraz, which was the case decided, I believe, back in June. The court in both of those cases denied the motion for, in part, because they were immaterial documents. The documents that he submitted, while they may, I'd say, pile on more evidence in support of him saying that he was in Albania at the time, they don't actually go to why he lied during the airport statement. So, I mean, he needs to get over the hump of saying why he lied. And it's the same as in Toofiegee. There was the gentleman, he said he was Iranian. He said he had converted to Christianity. And in his motion to reopen, all he did was submit evidence saying, look, the Iranians are persecuting Christians in that country. And the board in the court said, well, look,  So the documentation that you've submitted is immaterial to your case. And I would submit that that's the same as the evidence that Mr. Ducey has submitted here. If there are any other questions. Well, what evidence are you talking about now? Now we're talking about the letter from the aunt, which is really just a three-liner, which doesn't say much. It's just saying that he was there during a certain time. There's the baptism certificate. Well, that's also immaterial because this isn't a religion case. It's a political case. The only reason why religion came up was because he stayed at the airport interview. I changed my name when I was in Greece at the time that I switched to Christianity. So that's the only reason why the IJ and the board mentioned religion at all. And then there's Dr. Fisher's note, which just bears on his being afraid. He's saying, well, look, there are all these, Albania, there's evidence that they beat on people there. Well, that's in the country report, so it doesn't really, it might be quantitatively new, but it's certainly not quantitatively new. What were the conditions in Albania at the time he fled? At the time, the Democratic Party and the Socialist Party were vying for power democratically and the Albanian government locally and at the national level. I believe at the time, the Socialists were pretty much in power or had more of the power, but as I noted, as of July 2005. How were the police treating the people, gently and kindly, like they do here? Well, it depends on what city you're in. But as far as I know, there was evidence that people were being beaten on both sides, depending on where you are. In some areas, there was democratic control. In some areas, there was socialist control. Albania is a country, I believe, at least at the time, one of the documents said it's a country of about three and a half million people. So there were problems for both sides at that time. If there are no other questions, I'll conclude. I know I'm way over my time. For the reasons I've stated before, I accept the court denied both petitions for review. Thank you. Thank you. May it please the Court? I'd like to just point out that Professor Fisher's affidavit, it was submitted after the Democratic Party won the national elections, and therefore it had to be submitted or otherwise people could say, well, who's your case now? Why don't you just go on back? Your party's won. Now, what Professor Fisher indicates is he points out that in Albania, everything is over access to resources. This breaks down. And it's not just the family in a party. It's a whole clan in a party. So when Mr. Dushan was beaten up and billished the last time, the chief of police who led this beat said to him, you're trying to overthrow us. And that, in a way, is right because he was going to be out. And also, as the professor points out, there's a symbiotic connection with the underworld, the government in the underworld, especially in sex trafficking. But he says Albanians, this is AR00088. What was that, trafficking? Sex trafficking. Oh, sex trafficking. Okay. And he says that Albanians tend to view those in opposition with acrimony verging on low-level war. A few of the political parties have yet to accept the concept of a loyal opposition. Most see members of the opposition as little more than traitors who should be in jail or dead. And that attitude was exactly what came out in the last beating when he was beaten up by the police chief of his city and billished. Now, the reason I brought up the Iranian case, Judge Burson, in her dissent, says that the government routinely notifies the countries of persecution about the applicants. And she cited the case from the Seventh Circuit. And that's why I asked for judicial notice of that case, because it found Bushagi. It found in one instance that the United States did notify Nigeria. And this put this man in jeopardy. Now, the thing is that he submitted, the evidence that we submitted, compels a finding that he's credible. It indicates that he was in Albania, in Greece, from September to January. September 1997 to January 1998. Because the Democratic Party booklet starts in June 1998. And he remained in the Democratic Party until he left. The first jailing was in September 1998. The shooting in Varnash was on December 7th, 1999. The second arrest was in May 2001. Then the savage beating from the chief of police in Bush occurred in July, right before he left. And again, right before the presidential elections. Professor Fisher is tying in this violence to the attempt to hold your power. Because this is a very impoverished country. An attempt to hold what?  Hold power? Hold power, yes, sir. Yes, your honor. To terrorize the opposition. And this is exactly what they did. You're trying to overthrow us. That's how they thought. And this is what Professor Fisher says is the attitude in that country. We want the resources, not you. And these people came up from one of the most brutal communist regimes in Europe, where this whole mindset, if you're not with me, you're against me, was formed. Now, as also the, I'd like to point out, there was a, the board seems to speculate, in its denial of the motion to reopen, that there was somehow an off-the-record conversation. Well, that, I have a 28-K letter there that this was ultra-violence, that this happened. I don't remember any off-the-record conversation. There's no record of, you know, usually when they say we're back on the record and this is what we discussed. But there was nothing like that. There was no off-the-record conversation requesting the letter from the aunt. And he was not given any chance to explain this. And then there's another 28-K letter I submitted that says that notification cannot be given, this is a fingerprint case, to the lawyer. It has to be given to the respondent in his language. So otherwise the fingerprint violation was void because it was the lawyer who was told. And then a continuance depends upon the significance of the matter. Now, if she had looked through the documents we presented, she could have seen there was no letter from the aunt. And this whole problem could have been solved then. Thank you very much. And I thank you. This matter will stand submitted. And we'll go to the next case, which is Martinez-Sutander v. Holder.
judges: Pregerson, Nelson D. W., Ikuta